## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :
    :
          v.     :
    :
REZA SARHANGPOUR KAFRANI     :
AKA REZA SARHANG,     :
    :
    :
        Defendants.     :
    :

Case: 1:21−mj−00514
Assigned To : Harvey, G. Michael
Assign. Date : 7/5/2021
Description: COMPLAINT W/ ARREST WARRANT

### AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Christopher O'Neill being duly sworn, depose and state as follows:

**I.     INTRODUCTION AND SUMMARY OF PROBABLE CAUSE**

1.     I have participated in the investigation of Iranian national **REZA SARHANGPOUR KAFRANI** and others, who were involved in a scheme to illegally procure, and attempt to procure inductively coupled plasma mass spectrometers (ICP/MS) and gas chromatograph mass spectrometers (GC/MS) for export to Iran.  Both items have sensitive military and civilian applications.

**II.    AGENT BACKGROUND**

2.     I am a Special Agent with the U.S. Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE"), and have been since May 2016.  I am currently assigned to the New York Field Office, where I investigate matters relating to potential violations of export control regulations administered and enforced by the DOC.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is a government agent engaged in enforcing the criminal laws and duly

authorized by the Attorney General to request a search warrant.  Before joining BIS, I was a Special Agent with the U.S. Air Force Office of Special Investigations from 2011 to 2016.  During my work with the BIS, I have executed and participated in the execution of search warrants and have seized evidence of criminal violations in connection with those search warrants. I have received training in the laws and regulations relating to the International Emergency Economic Powers Act ("IEEPA"), pursuant to Title 50, United States Code, Sections 1701 through 1707.

3.      The facts set forth in this affidavit are based on information I have obtained from my personal involvement in the investigation, other law enforcement officers who have been involved in this investigation, and documents I have reviewed.  Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Because this affidavit is being submitted for a limited purpose, I have not set forth all of the information known to me concerning this investigation.  Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of the government's application for an arrest warrant.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that **REZA SARHANGPOUR KAFRANI** and other CO-CONSPIRATORS known and unknown, have conspired, in violation of 18 U.S.C. § 371, to violate the Iranian Transactions and Sanctions Regulations (31 C.F.R Part 560) as detailed below.  There is moreover probable cause to believe that they have violated the International Emergency Economic Powers Act, 50 U.S.C. § 1705, as detailed below:

III.     **THE DEFENDANT & OTHER PERSONS AND ENTITIES**

6.     1.     Defendant REZA SARHANGPOUR KAFRANI also known as "REZA SARHANG," is an Iranian citizen, who resides in Canada.

7.     CO-CONSPIRATOR 1, is a citizen of both Iran and Canada, and was affiliated with the Sharif University of Technology in Iran.

8.     SARHANG and CO-CONSPIRATOR 1 co-owned Prolife Global, Ltd. (Prolife), which was based and incorporated in Canada, and conducted business within United States and elsewhere.

9.     U.S. COMPANY 1 was a United States business organization specializing in the sale of refurbished laboratory equipment.

10.     U.S. COMPANY 2 was a United States business organization that supplied and sold used laboratory equipment.

IV.     **SUMMARY FACTS**

11.     The United States Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), administers and enforces export controls, and requires export licenses for certain transactions as further described herein.  DOC was located in the District of Columbia at all times relevant to this criminal complaint.  The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC") administers and enforces economic and trade sanctions in support of U.S. national security and foreign policy objectives.  OFAC was located in the District of Columbia at all times relevant to this criminal complaint.

12.     7.     Beginning in or around February 2015 to in or around November 2016, in the District of Columbia and elsewhere, defendants SARHANG and CO-CONSPIRATOR 1 conspired with persons known and unknown to procure products from U.S. COMPANY 1 and

U.S. COMPANY 2, and to export those products from the United States to Iran, through Canada and the United Arab Emirates.

**The International Emergency Economic Powers Act, the Iranian Transactions and Sanctions Regulations, and the Export Administration Regulations**

13.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States (the President) to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving goods.

14.     Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

15.     On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the Executive Orders), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), subsequently reissued

and renamed the Iranian Transactions and Sanctions Regulations ("ITSR"), implementing the sanctions imposed by the Executive Orders.

16.     The ITSR generally prohibited any person from exporting or causing to be exported from the United States to Iran any goods or technology without having first obtained a valid export license from OFAC, which was located in the District of Columbia. The ITSR were in effect at all times relevant to this criminal complaint. The ITSR imposed, among others, the following prohibitions:

17.     **Section 560.203** Evasions; attempts; causing violations; conspiracies.

18.     Any transaction on or after the effective date that evades, or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

19.     Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

20.     **Section 560.204** Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran.

21.     Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

22.     Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran…

23.     **Section 560.205** Prohibited reexportation of goods, technology, or services to Iran or the Government of Iran by persons other than United States persons; exceptions.

24.     Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States is prohibited if:

25.     (1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

26.     (2) The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

27.     Pursuant to IEEPA, 50 U.S.C. §§ 1701-1705, BIS, through the Export Administration Regulations ("EAR") (15 C.F.R. Parts 730-774), reviewed and controlled the export of certain items, including goods, software, and technologies, often called dual-use items, from the United States to foreign countries.

28.     In particular, the EAR restricted the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR imposed licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.

29.     The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which had export control

requirements depending on destination, end use, and end user. An ECCN identified the export controls associated with a specific item.

30.     Under the CCL, mass spectrometers that are capable of measuring ions of 230 atomic mass unites or greater and have a resolution of better than 2 parts in 230 are controlled under ECCN 3A233. Items controlled under ECCN 3A233 are controlled for reasons of Anti-Terrorism and Nuclear Nonproliferation.

31.     Similarly, under the CCL, other mass spectrometers not elsewhere specified and chromatography and spectrometery analytical instruments are controlled under ECCN 3A999. Items controlled under ECCN 3A999 are controlled for reasons of Anti-Terrorism.

32.     Items controlled for Nuclear Nonproliferation reasons required a license for export to the United Arab Emirates and Iran. Items controlled for Anti-Terrorism reasons required a license for export to Iran. Items designated EAR99 require a license for export to Iran.

33.     EAR99 is a designation for an item that is subject to other general provisions of the EAR, but not listed with a specific ECCN on the CCL (requiring a license by BIS for specific countries). EAR99-designated items will generally ship under the export designation "NLR," which stands for "No License Required." Exports of EAR99 items may require an export license if exported to an embargoed country, to a party of concern, or in support of a prohibited end use.

**Background on Mass Spectrometry**

34.     Mass spectrometry describes the analysis in nuclear science of the isotopic content of chemical samples and, in particular, the concentration measurements of these elements using isotope dilution techniques. Different types of mass spectrometers are used in the nuclear industry to analyze isotope composition of nuclear material, including inductively coupled plasma mass

spectrometers (ICP/MS), gas chromatograph mass spectrometers (GC/MS), and thermal ionization mass spectrometers (TIMS).

35.    Mass spectrometers can be used to monitor the performance of uranium enrichment processes composition of materials. In particular, they allow those enriching uranium to determine the level of enrichment, which is an essential part of enriching uranium for nuclear power and/or weaponization efforts.

36.    Complete mass spectrometers consist of several different subsystems, including a mass analyzer, vacuum system, computer, and power supply.

**The Nuclear Suppliers Group**

37.    The Nuclear Suppliers Group ("NSG") is a multilateral export control forum that consists of 48 participating countries, including the United States. The NSG maintains a list of dual-use items that have both a nuclear and non-nuclear end use, and could be used for nuclear proliferation activities, including mass spectrometers. NSG participating countries share a commitment to prevent nuclear proliferation and the development of nuclear related weapons of mass destruction. In furtherance of that commitment, they have undertaken to impose export controls on listed items. The NSG Guidelines and the Annex thereto are designed to ensure that nuclear trade for peaceful purposes does not contribute to the proliferation of nuclear weapons or related proliferation activities, including "nuclear explosive activity" and "unsafeguarded nuclear fuel-cycle activity."

38.    The list is maintained in the NSG Annex to the "Guidelines for the Transfer of Nuclear Related Dual Use Equipment, Materials, Software and Related Technology" (the NSG Dual Use Annex). This Annex is referred to as the Part 2 or Dual Use annex and is regularly updated and published by the International Atomic Energy Agency ("IAEA") via an "Information

Circular"(abbreviated as "INFCIRC"). Specifically, the NSG Dual-Use Annex is published by the IAEA in INFCIRC/254/Part 2.

39.     NSG participating countries have agreed to the principles, common definitions, and export control list of equipment, materials, software, and related technology described in the NSG Guidelines and more specifically listed in the NSG Dual Use Annex. NSG participating countries establish laws, regulations, and policies to implement the NSG Guidelines in accordance with national legislation and relevant international commitments.

40.     The United States implements the agreed export restrictions from the NSG Dual Use Annex through "NP Column No. 1," which restricts exports for reasons of Nuclear Nonproliferation to specified countries listed in Supplement No. 1 to Part 738 of the EAR.

41.     At all times relevant to this criminal complaint, mass spectrometers capable of measuring ions of 230 u or greater and having a resolution of better than 2 parts in 230, including inductively coupled plasma mass spectrometers (ICP/MS), were listed in the NSG Dual Use Annex.

42.     Currently, and at all times relevant to the criminal complaint, the participating governments in the NSG were Argentina, Australia, Austria, Belarus, Belgium, Brazil, Bulgaria, Canada, China, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Kazakhstan, Republic of Korea, Latvia, Lithuania, Luxembourg, Malta, Mexico, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Russian Federation, Serbia, Slovakia, Slovenia, South Africa, Spain, Sweden, Switzerland, Turkey, Ukraine, United Kingdom, and the United States.

**Electronic Export Information**

43.     The DOC, through the U.S. Census Bureau ("BOC"), at all times relevant hereto, required the filing of electronic export information ("EEI") through the Automated Export System ("AES") pursuant to Title 13, United States Code, Section 305; the EAR; and the Foreign Trade Regulations ("FTR"), Title 15, Code of Federal Regulations, Part 30. The purpose of these requirements was to strengthen the United States government's ability to prevent the export of certain items to unauthorized destinations and end-users because the AES aided in targeting, identifying, and, when necessary, confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).

44.     At all times relevant hereto, and with exceptions not relevant to the exports at issue in this criminal complaint, EEI was required to be filed for, among other things, the export of commodities (1) valued over $2,500 per the Harmonized Tariff Schedule of the United States of America ("HTSUSA") commodity classification code; (2) destined for Iran, regardless of value; and (3) requiring an export license, regardless of value or destination. EEI was required to contain, among other things: the names and addresses of the parties to the transaction; and the description, quantity, and value of the items exported. 15 C.F.R. § 30.6(a).

45.     Any person who knowingly fails to file or knowingly submits false or misleading EEI through AES, or willfully causes another person to fail to file EEI through AES, shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both. 13 U.S.C. §§ 305 & 2.

46.     Beginning at least in or around February 2015, and continuing through at least in or around October 2016, Defendants SARHANG and CO-CONSPIRATOR 1 did willfully combine, conspire, and agree with others known and unknown, to: (a) commit an offense against the United States, that is, to export, attempt to export, and attempt to cause the exportation of goods

10

from the United States to Iran in violation of the prohibitions imposed upon that country by the United States government, without having first obtained the required licenses from OFAC, located in the District of Columbia, in violation of Title 50, United States Code, Section 1705 (IEEPA), and Title 31, Code of Federal Regulations, Parts 560.203, 560.204 and 560.205 (ITSR); and (b) defraud the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods from the United States to Iran without having first obtained the required licenses from OFAC, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

47.    CO-CONSPIRATOR 1 and SARHANG co-owned Prolife and in or around January 2015 began working to procure laboratory products from U.S. companies for shipment to Iran.

48.    Beginning in or around January 2015 to in or around October 2016, CO-CONSPIRATOR 1 and SARHANG placed an order with U.S. COMPANY 2 for laboratory equipment and paid U.S. COMPANY 2 for the purchase and export of those products to Canada. CO-CONSPIRATOR 1  and SARHANG and others known and unknown, would then cause and attempt to cause the products to be shipped from the United States to Canada, and then have them shipped to Iran through the United Arab Emirates, seeking to hide the true location and nature of the end users in Iran.

49.    The conduct alleged in this Count occurred within the District of Columbia and elsewhere and is therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Sections 3237(a) and 3238.

**September 2016 Export of One Mass Spectrometer to Iran**

50.     In or about May 2015, CO-CONSPIRATOR 1 requested information from the Canadian government on how to purchase laboratory instruments from Canada and send them to Iran.  The Candian government responded, advising CO-CONSPIRATOR 1 about the country's sanctions against Iran.

51.     In or about October 2015, CO-CONSPIRATOR 1 sent an email to SARHANG with a news report link titled "Montreal men accused of illegally exporting railway equipment to Iran," and a note in Persian, stating, "This is dangerous!  We have to talk."

52.     On November 6, 2015, CO-CONSPIRATOR 1 sends SARHANG links to U.S. government websites about U.S. export laws and sanctions with Iran, including websites for the U.S. Department of Treasury and the BIS.

53.     In or about November 2015, SARHANG, in consultation with CO-CONSPIRATOR 1, negotiated with U.S. COMPANY 1 to purchase mass spectrometry instruments for import to Canada.  During these negotiations, CO-CONSPIRATOR 1 e-mailed suggested responses for SARHANG to provide to U.S. COMPANY 1.  SARHANG in turn provided those responses to U.S. COMPANY 1.  On or about November 10, 2015, SARHANG asked U.S. COMPANY 1 whether the installation costs are the same for the Middle East.  The representative from U.S. COMPANY 1 responded stating, "We do not do installs in the middle east.  The install for these instruments is in Montreal QB correct?"  SARHANG forwarded that response to CO-CONSPIRATOR 1.  On or about November 11, U.S. COMPANY 1 emailed SARHANG, "You know there are sanctions in place for Iran.  I thought this equipment was going to Montreal QB.  Thanks for wasting my time."  SARHANG forwarded that response to CO-CONSPIRATOR 1.  Later that day, U.S. COMPANY 1 sends an e-mail to SARHANG, "Sorry for getting upset but you never told me this was going to Iran. I am looking into see if we can get

clearance. Even if we do we are not going to do the install there". SARHANG forwarded that email to CO-CONSPIRATOR 1.   On or about November 11, 2015, CO-CONSPIRATOR 1 sends a suggested response for U.S. COMPANY 1 to SARHANG citing U.S. regulations and sanctions with Iran.  SARHANG in turn provided that response to U.S. COMPANY 1 stating there is a general license for laboratory equipment and "spectrometry instruments can be exported to Iran without needing further permission from OFAC office."

54.     On or about November 16, 2015, CO-CONSPIRATOR 1 and SARHANG applied for a license from OFAC to send a gas liquid chromatography system and mass spectrometer from U.S. COMPANY 1 to the Ebn Sina Laboratory in Iran.  On February 17, 2016, this application was denied, requesting additional information, specifically an EAR99 commodity classification from BIS.  On March 28, 2016, CO-CONSPIRATOR 1 applied for an export license from BIS. On April 12, 2016, BIS provided a Return Without Action (RWA) notice to CO-CONSPIRATOR 1 identifying OFAC as the primary party responsible for administering the sanctions against Iran; therefore OFAC should be consulted regarding export authorization.  Additionally, the BIS RWA notification confirmed the items were not EAR99, but instead were controlled for export under the Export Control Classification Numbers (ECCNs) 3A999 and 3A233.  On April 23, 2016, CO-CONSPIRATOR 1 submitted a second application to OFAC and included the BIS RWA notification.  On April 26, 2016, OFAC denied the license application, requesting additional information pertaining to the end users and confirmation the items were EAR99.    On May 2, 2016, CO-CONSPIRATOR 1 exchanged email communications with SARHANG wherein all three denied license applications were referenced.

55.    In March 2016, SARHANG began negotiating with U.S. COMPANY 2 to purchase the laboratory equipment he and CO-CONSPIRATOR 1 had requested U.S. export licenses for. SARHANG forwarded correspondence with U.S. COMPANY 2 to CO-CONSPIRATOR 1.

56.    On or about June 30, 2016, SARHANG, CO-CONSPIRATOR 1 , and others, began making payments to COMPANY 2 for the purchase and export of a PerkinElmer Elan 9000 Inductively Coupled Plasma Mass Spectrometer (ICP/MS), an Agilent 7890A Network Gas Chromatograph (GC), an Agilent 7000B Triple Quadropole Gas Chromatography-Mass Spectrometry (GC/MS) system, and an Agilent 7693A Automatic Liquid Sampler (Autosampler). A total of eight (8) payments were made, concluding in September 2016 and totaling approximately $110,739.  The payments were made from various sources with the assistance of other co-conspirators at the direction of SARHANG and CO-CONSPIRATOR 1.

57.    The first item to ship was the PerkinElmer Elan 9000 ICP/MS.  The Elan 9000 ICP/MS was classified on the Commerce Control List under ECCN 3A233 and controlled for both Anti-Terrorism and Nuclear Non-Proliferation reasons.

58.    On or about August 24, 2016, CO-CONSPIRATOR 1 and SARHANG, and co-conspirators, then paid U.S. COMPANY 2 to arrange for the shipment of PerkinElmer Elan 9000 ICP/MS to Canada.[1]

59.    On or about September 7, 2016, CO-CONSPIRATOR 1 and SARHANG, and co-conspirators, then coordinated with a Canada based shipping company to ship the PerkinElmer Elan 9000 ICP/MS to the United Arab Emirates.

---

[1] The information in paragraphs 57-59 and 66-68 is based on reviews of emails between Co-Conspirator 1, Sarhang and the shipping companies, documents obtained by grand jury subpoenas and witness interviews.

60.     On or about September 25, 2016, CO-CONSPIRATOR 1 and SARHANG, and co-conspirators, then coordinate with a United Arab Emirates based shipping company to ship the PerkinElmer Elan 9000 ICP/MS to Iran.

**October 2016 Export and Attempted Export of One Gas Chromatograph, One Mass Spectrometer, and One Auto Sampler to Iran**

61.     The PerkinElmer Elan 9000 ICP/MS was part of a larger order that SARHANG and CO-CONSPIRATOR 1 placed with U.S. COMPANY 2 in March 2016.  In August 2016, after they placed the order with U.S. COMPANY 2 for the PerkinElmer ICP/MS system and the Agilent GC/MS system but before any of the items shipped, U.S. COMPANY 2 notified SARHANG that refurbishment of the Agilent equipment would take longer, and as a result, the Elan 9000 ICP/MS would ship first.

62.     In or about September 2016, CO-CONSPIRATOR 1 and SARHANG finalized purchases from U.S. COMPANY 2 of an Agilent 7890A Network Gas Chromatograph (GC), an Agilent 7000B Triple Quadrupole Gas Chromatograph Mass Spectrometer (GC/MS) system, and an Agilent 7693A Automatic Liquid Sampler (Autosampler).

63.     The Agilent 7890A Network Gas Chromatograph was classified on the Commerce Control List under ECCN 3A999.f and controlled for Anti-Terrorism reasons.

64.     The Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS) system was classified on the Commerce Control List under ECCN 3A233 and controlled for Anti-Terrorism and Non-Proliferation reasons.

65.     The Agilent 7693A "Autosampler" was classified under EAR99.

66.     CO-CONSPIRATOR 1 and SARHANG, and co-conspirators, then arranged for a Canada based shipping company to pick up the Agilent 7890A Network Gas Chromatograph (GC),

an Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS) system, and an Agilent 7693A Automatic Liquid Sampler (Autosampler) directly from U.S. COMPANY 2 to transport them to Canada, on or about October 5, 2016.

67.     CO-CONSPIRATOR 1 and SARHANG, and co-conspirators, then hired the same Canda based shipping company to transport the the Agilent 7890A Network Gas Chromatograph (GC), an Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS) system, and an Agilent 7693A Automatic Liquid Sampler (Autosampler to the United Arab Emirates, on or about October 7, 2016.

68.     CO-CONSPIRATOR 1 and SARHANG, and co-conspirators, then caused and hired a United Arab Emirates based shipping company to transport the  the Agilent 7890A Network Gas Chromatograph (GC), an Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS) system and an Agilent 7693A Automatic Liquid Sampler (Autosampler) to Iran.

**Failure to Obtain Required Licenses**

69.     The defendants and their coconspirators failed to receive, and possess, and caused others to fail to receive, and possess one or more license(s) from OFAC, located in the District of Columbia, to export any of the goods set forth above from the United States to Iran.

**CONCLUSION**

70.     Based on facts described above, there is probable cause to believe that **REZA SARHANGPOUR KAFRANI** and co-conspirators, known and unknown, have conspired to violate IEEPA and have in fact violated IEEPA, in violation of 18 U.S.C. § 371 and 50 U.S.C. § 1705.

_____
Christopher O'Neill
Special Agent
Department of Commerce
Office of Export Enforcement

Sworn to via telephone after submission by reliable electronic means, Fed. R. Crim. P. 3, 4(d), and 4.1, on this 5th day of July 2021.

G. Michael Harvey
2021.07.05 20:12:39 -04'00'
_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE