## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 25, 2021**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **Grand Jury Original** |
| | : | |
| REZA SARHANGPOUR KAFRANI, | : | **VIOLATIONS:** |
| Also known as | : | |
| "REZA SARHANG," | : | 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| | : | |
| | : | 50 U.S.C. § 1705 |
| **and** | : | (International Emergency Economic |
| | : | Powers Act) |
| SEYED REZA MIRNEZAMI | : | |
| | : | 31 C.F.R. Part 560 |
| | : | (Iranian Transactions and Sanctions |
| | : | Regulations) |
| Defendants. | : | |
| | : | 15 C.F.R. Parts 730-774 |
| | : | (Export Administration Regulations) |
| | : | |
| | : | 13 U.S.C. § 305 |
| | : | (Unlawful Export Information Activities) |
| | : | |
| | : | 15 C.F.R. Part 30 |
| | : | (Foreign Trade Regulations) |
| | : | |
| | : | 18 U.S.C. § 1956(a)(2)(A) |
| | : | (International Money Laundering) |
| | : | |
| | : | **FORFEITURE** |
| | : | 18 U.S.C. §§ 982(a)(1) & (b)(1); |
| | : | 21 U.S.C. § 853(p); and |
| | : | 28 U.S.C. § 2461(c) |
| | : | |

1

# INDICTMENT

The Grand Jury charges that:

At times material to this Indictment:

## The Defendants and Other Individuals and Entities

1. Defendant REZA SARHANGPOUR KAFRANI, also known as "REZA SARHANG" (hereinafter referred to as "SARHANG"), was an Iranian citizen, who resided in Canada.

2. Defendant SEYED REZA MIRNEZAMI ("MIRNEZAMI"), was a citizen of both Iran and Canada, who resided in Iran, and was affiliated with the Sharif University of Technology in Iran.

3. SARHANG and MIRNEZAMI co-owned Prolife Global, Ltd. ("Prolife"), which was based and incorporated in Canada, and conducted business within United States and elsewhere.

4. U.S. COMPANY 1 was a United States business organization specializing in the sale of refurbished laboratory equipment.

5. U.S. COMPANY 2 was a United States business organization that supplied and sold used laboratory equipment.

6. The United States Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), administers and enforces export controls, and requires export licenses for certain transactions as further described herein. BIS was located in the District of Columbia at all times relevant to this indictment. The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), administers and enforces economic and trade sanctions in support of U.S. national security and foreign policy objectives. OFAC was located in the District of Columbia at all times relevant to this indictment.

2

7.     Beginning in or around February 2015 to in or around January 2017, in the District of Columbia and elsewhere, defendants SARHANG and MIRNEZAMI conspired with persons known and unknown to the Grand Jury to procure products from U.S. COMPANY 1 and U.S. COMPANY 2, and to export those products from the United States to Iran, through Canada and the United Arab Emirates, without having first obtained the required licenses from OFAC and BIS.

### The International Emergency Economic Powers Act, the Iranian Transactions and Sanctions Regulations, and the Export Administration Regulations

8.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving goods.

9.     Beginning with Executive Order No. 12,170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

10.     On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous

3

orders (collectively, the "Executive Orders").   The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.   Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders.

11.   The ITSR generally prohibited any person from exporting or causing to be exported from the United States to Iran any goods or technology without having first obtained a valid export license from OFAC, which was located in the District of Columbia. The ITSR were in effect at all times relevant to this Indictment. The ITSR imposed, among others, the following prohibitions:

> **Section 560.203 Evasions; attempts; causing violations; conspiracies.**
>
> (a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.
>
> (b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.
>
> **Section 560.204 Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran.**
>
> Except as otherwise authorized pursuant to [the ITSR], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . . .

4

**Section 560.205 Prohibited reexportation of goods, technology, or services to Iran or the Government of Iran by persons other than United States persons; exceptions.**

(a) Except as otherwise authorized pursuant to this part . . ., the reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States is prohibited if:

(1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

(2) The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

12.     Pursuant to IEEPA, 50 U.S.C. §§ 1701-1705, BIS, through the Export Administration Regulations ("EAR") (15 C.F.R. Parts 730-774), reviewed and controlled the export of certain items, including goods, software, and technologies, often called dual-use items, from the United States to foreign countries.

13.     In particular, the EAR restricted the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR imposed licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.

14.     The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which had export control

requirements depending on destination, end use, and end user. An ECCN identified the export controls associated with a specific item.

15.     Under the CCL, mass spectrometers that are capable of measuring ions of 230 atomic mass units or greater and have a resolution of better than 2 parts in 230 are controlled under ECCN 3A233. Items controlled under ECCN 3A233 are controlled for reasons of Anti-Terrorism and Nuclear Nonproliferation.

16.     Similarly, under the CCL, other mass spectrometers not elsewhere specified and chromatography and spectrometery analytical instruments are controlled under ECCN 3A999. Items controlled under ECCN 3A999 are controlled for reasons of Anti-Terrorism.

17.     Items controlled for Nuclear Nonproliferation reasons required a license for export to the United Arab Emirates and Iran. Items controlled for Anti-Terrorism reasons required a license for export to Iran. Items designated EAR99 also require a license for export to Iran.

18.     EAR99 is a designation for an item that is subject to other general provisions of the EAR, but not listed with a specific ECCN on the CCL (requiring a license by BIS for specific countries). EAR99-designated items will generally ship under the export designation "NLR," which stands for "No License Required." But exports of EAR99 items may require an export license if exported to an embargoed country, to a party of concern, or in support of a prohibited end use.

### Background on Mass Spectrometry

19.     Mass spectrometry describes the analysis in nuclear science of the isotopic content of chemical samples and, in particular, the concentration measurements of these elements using isotope dilution techniques. Different types of mass spectrometers are used in the nuclear industry

to analyze isotope composition of nuclear material, including inductively coupled plasma mass spectrometers ("ICP/MS"), gas chromatograph mass spectrometers ("GC/MS"), and thermal ionization mass spectrometers ("TIMS").

20.     Mass spectrometers can be used to monitor the performance of uranium enrichment processes composition of materials. In particular, they allow those enriching uranium to determine the level of enrichment, which is an essential part of enriching uranium for nuclear power and weaponization efforts.

21.     While a number of elements can undergo fission, only a few are used in nuclear weapons. Most common are the isotopes uranium-235 and plutonium-239, which have an atomic mass above 230. Accordingly, a mass spectrometer that can measure atomic mass above 230 is required to measure nuclear fissile material.

22.     Complete mass spectrometers consist of several different subsystems, including a mass analyzer, vacuum system, computer, and power supply.

### Electronic Export Information

23.     The DOC, through the U.S. Census Bureau, at all times relevant hereto, required the filing of electronic export information ("EEI") through the Automated Export System ("AES") pursuant to Title 13, United States Code, Section 305; the EAR; and the Foreign Trade Regulations ("FTR"), Title 15, Code of Federal Regulations, Part 30. The purpose of these requirements was to strengthen the United States government's ability to prevent the export of certain items to unauthorized destinations and end-users because the AES aided in targeting, identifying, and, when necessary, confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).

24.     At all times relevant hereto, and with exceptions not relevant to the exports at issue in this Indictment, EEI was required to be filed for, among other things, the export of commodities (1) valued over $2,500 per the Harmonized Tariff Schedule of the United States of America commodity classification code; (2) destined for Iran, regardless of value; and (3) requiring an export license, regardless of value or destination. EEI was required to contain, among other things: the names and addresses of the parties to the transaction; and the description, quantity, and value of the items exported. 15 C.F.R. § 30.6(a).

### COUNT ONE

### (Conspiracy to Unlawfully Export Goods to Iran via the United Arab Emirates, and to Defraud the United States)

#### A. THE CONSPIRACY

25.     Beginning at least in or around February 2015, and continuing through at least in or around January 2017, Defendants SARHANG and MIRNEZAMI did willfully combine, conspire, and agree with others known and unknown to the Grand Jury, to: (a) commit an offense against the United States, that is, to export, attempt to export, and attempt to cause the exportation of goods from the United States to Iran, via the United Arab Emirates, in violation of the prohibitions imposed upon exports to both Iran and the United Arab Emirates by the United States government, without having first obtained the required licenses from OFAC and BIS, both located in the District of Columbia, in violation of Title 50, United States Code, Section 1705, Title 31, Code of Federal Regulations, Parts 560.203, 560.204, and 560.205, and Title 15, Code of Federal Regulations, Sections 764.2(a) and (b); and (b) defraud the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods from the United States to Iran and the United

Arab Emirates without having first obtained the required licenses from OFAC and BIS, and the ascertainment and collection of customs and export information and the authority to inspect and examine cargo crossing the United States border, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

26.     The conduct alleged in this Count occurred within the District of Columbia and elsewhere and is therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Sections 3237(a).

## B. GOALS OF THE CONSPIRACY

27.     The goals of the conspiracy were:

    A.     to acquire goods from the United States in order to supply these goods to end users in Iran;

    B.     to conceal from United States companies that the goods were destined for Iranian end users;

    C.     to evade the regulations, prohibitions, and licensing requirements of IEEPA, the ITSR, and the EAR;

    D.     to evade the regulations and reporting requirements of the FTR; and

    E.     to make a financial profit for the defendants and their co-conspirators.

## C. MANNER AND MEANS OF THE CONSPIRACY

28.     The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

    A.     The defendants and their co-conspirators planned and acted outside the United States to acquire goods.

B.     The defendants and their co-conspirators used e-mail to communicate with one another and with other individuals, including individuals located in the United States, Canada, the United Arab Emirates, and Iran.

C.     The defendants and their co-conspirators purchased goods from companies in the United States for ultimate shipment to Iran.

D.     The defendants and their co-conspirators intentionally concealed from companies located in the United States, including U.S. COMPANY 1 and U.S. COMPANY 2, the true nature of the ultimate end use and the true identities of the ultimate end users of the goods, by providing false and misleading information about the ultimate end use and end users.

E.     The defendants and their co-conspirators caused the goods to be exported, and attempted to cause the goods to be exported, from the United States to individuals and entities located in Iran through Canada, and the United Arab Emirates, without obtaining a license from OFAC, located in the District of Columbia, or from BIS, also located in the District of Columbia.

## D. <u>OVERT ACTS</u>

29.     In furtherance of the above-described conspiracy, and in order to carry out the object thereof, the defendants and others known and unknown to the Grand Jury committed and caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

30.     MIRNEZAMI and SARHANG co-owned Prolife and in or around February 2015 began working to procure laboratory products from U.S. companies for shipment to Iran.

31.     Beginning in or around February 2015 to in or around October 2016, MIRNEZAMI and SARHANG placed an order with U.S. COMPANY 2 for laboratory equipment and paid U.S.

COMPANY 2 for the purchase and export of those products to Canada. MIRNEZAMI and SARHANG and others known and unknown to the Grand Jury, would then cause and attempt to cause the products to be shipped from the United States to Canada, and then have them shipped to Iran through the United Arab Emirates, seeking to hide the true location and nature of the end users in Iran. Continuing through January 2017, SARHANG and MIRNEZAMI continued to conspire with others to re-sell the equipment in Iran and share the profits among their co-conspirators.

### September 2016 Export of One Mass Spectrometer to Iran and the United Arab Emirates

32.    In or about May 2015, MIRNEZAMI requested information from the Canadian government on how to purchase laboratory instruments from Canada and send them to Iran. The Candian government responded, advising MIRNEZAMI about the country's sanctions against Iran.

33.    In or about October 2015, MIRNEZAMI sent an email to SARHANG with a news report link titled "Montreal men accused of illegally exporting railway equipment to Iran," and a note in Persian, stating, "This is dangerous! We have to talk."

34.    On or about November 6, 2015, MIRNEZAMI sent SARHANG links to U.S. government websites about U.S. export laws and sanctions with Iran, including OFAC and BIS websites related to export control and sanctions regulations.

35.    In or about November 2015, SARHANG, in consultation with MIRNEZAMI, negotiated with U.S. COMPANY 1 to purchase mass spectrometry instruments for import to Canada. During these negotiations, MIRNEZAMI e-mailed suggested responses for SARHANG to provide to U.S. COMPANY 1. SARHANG in turn provided those responses to U.S. COMPANY 1. On or about November 10, 2015, SARHANG asked U.S. COMPANY 1 whether

the installation costs are the same for the Middle East. The representative from U.S. COMPANY 1 responded stating, "We do not do installs in the middle east. The install for these instruments is in Montreal QB correct?" SARHANG forwarded that response to MIRNEZAMI. On or about November 11, 2015, U.S. COMPANY 1 emailed SARHANG, "You know there are sanctions in place for Iran. I thought this equipment was going to Montreal QB. Thanks for wasting my time." SARHANG forwarded that response to MIRNEZAMI. Later that day, U.S. COMPANY 1 sends an e-mail to SARHANG, "Sorry for getting upset but you never told me this was going to Iran . I am looking into see if we can get clearance. Even if we do we are not going to do the install there". SARHANG forwarded that email to MIRNEZAMI. On or about November 11, 2015, MIRNEZAMI sends a suggested response for U.S. COMPANY 1 to SARHANG citing U.S. regulations and sanctions with Iran. SARHANG in turn provided that response to U.S. COMPANY 1, stating there is a general license for laboratory equipment and "spectrometry instruments can be exported to Iran without needing further permission from OFAC office."

36.     On or about November 16, 2015, MIRNEZAMI and SARHANG applied for a license from OFAC to send a gas liquid chromatography system and mass spectrometer from U.S. COMPANY 1 to the Ebn Sina Laboratory in Iran. On or about February 17, 2016, OFAC responded but did not approve this application, requesting additional information, specifically an EAR99 commodity classification from BIS for the items MIRNEZAMI and SARHANG proposed to export to Iran. Neither MIRNEZAMI nor SARHANG responded to OFAC with that additional information. Instead, on or about March 28, 2016, MIRNEZAMI applied for an export license from BIS. On or about April 12, 2016, BIS provided a Return Without Action ("RWA") notice to MIRNEZMI identifying OFAC as the primary party responsible for administering the sanctions

against Iran; therefore, OFAC should be consulted regarding export authorization to Iran. Additionally, the BIS RWA notification confirmed the items were not EAR99, but instead were controlled for export under ECCNs 3A999 and 3A233. On or about April 23, 2016, MIRNEZAMI submitted a second application to OFAC and included the BIS RWA notification. On or about April 26, 2016, OFAC responded but did not approve the license application, again requesting additional information, specifically information pertaining to the end users and confirmation the items were EAR99. On or about May 2, 2016, MIRNEZAMI exchanged email communications with SARHANG referencing all three license applications which were not approved.

37.     In or about March 2016, SARHANG began negotiating with U.S. COMPANY 2 to purchase the laboratory equipment for which he and MIRNEZAMI had requested U.S. export licenses. SARHANG then forwarded the correspondence with U.S. COMPANY 2 to MIRNEZAMI.

38.     On or about June 30, 2016, SARHANG, and others, began making payments to COMPANY 2 for the purchase and export of a PerkinElmer Elan 9000 Inductively Coupled Plasma Mass Spectrometer (ICP/MS), an Agilent 7890A Network Gas Chromatograph (GC), an Agilent 7000B Triple Quadropole Gas Chromatography-Mass Spectrometry (GC/MS) system, and an Agilent 7693A Automatic Liquid Sampler (Autosampler). A total of eight (8) payments were made, concluding in or around September 2016 and totaling approximately $110,739. The payments were made from various sources with the assistance of other co-conspirators at the direction of SARHANG.

39.     The first item to ship was the PerkinElmer Elan 9000 ICP/MS. The Elan 9000 ICP/MS was classified on the CCL under ECCN 3A233 and controlled for both Anti-Terrorism

and Nuclear Nonproliferation reasons. Because the PerkinElmer Elan 9000 ICP/MS was controlled for both Nuclear Nonproliferation and Anti-Terrorism reasons, a license was required for export both to the United Arab Emirates and to Iran.

40.     On or about August 24, 2016, MIRNEZAMI and SARHANG, and co-conspirators, directed U.S. COMPANY 2 to arrange for the shipment of the PerkinElmer Elan 9000 ICP/MS to Canada.

41.     On or about September 7, 2016, MIRNEZAMI and SARHANG, and co-conspirators, then coordinated with a Canada-based shipping company to reexport the PerkinElmer Elan 9000 ICP/MS to the United Arab Emirates.

42.     On or about September 25, 2016, MIRNEZAMI and SARHANG, and co-conspirators, then coordinated with a United Arab Emirates based shipping company to reexport the PerkinElmer Elan 9000 ICP/MS to Iran.

### October 2016 Export and Attempted Export of One Gas Chromatograph, One Mass Spectrometer, and One AutoSampler to Iran and the United Arab Emirates

43.     The PerkinElmer Elan 9000 ICP/MS was part of a larger order that SARHANG and MIRNEZAMI placed with U.S. COMPANY 2 in or about March 2016. In or about August 2016, after they placed the order with U.S. COMPANY 2 for the PerkinElmer Elan 9000 ICP/MS and the Agilent GC/MS system, but before any of the items shipped, U.S. COMPANY 2 notified SARHANG that refurbishment of the Agilent equipment would take longer, and as a result, the PerkinElmer Elan 9000 ICP/MS would ship first.

44.     In or about September 2016, MIRNEZAMI and SARHANG finalized purchases from U.S. COMPANY 2 of an Agilent 7890A Network Gas Chromatograph (GC), an Agilent 7000B Triple Quadropole Gas Chromatograph Mass Spectrometer (GC/MS) system, and an

Agilent 7693A Automatic Liquid Sampler (Autosampler).

    a.    The Agilent 7890A Network Gas Chromatograph was classified on the CCL under ECCN 3A999.f and controlled for Anti-Terrorism reasons. Accordingly, the Agilent 7890A Network Gas Chromatograph required a license for export to Iran.

    b.    The Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS) system was classified on the CCL under ECCN 3A233 and controlled for Anti-Terrorism and Nuclear Nonproliferation reasons. Therefore, the Agilent 7000B Gas Chromatograph Mass Spectrometer required a license for export to the United Arab Emirates and to Iran.

    c.    The Agilent 7693A Autosampler was classified under EAR99. Therefore, the Agilent 7693A Autosampler required a license for export to Iran.

45.    MIRNEZAMI, SARHANG, and co-conspirators arranged for a Canada-based shipping company to pick up the Agilent 7890A Network Gas Chromatograph (GC), the Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS) system, and the Agilent 7693A Autosampler directly from U.S. COMPANY 2 to transport them to Canada and then re-export them from Canada to the United Arab Emirates. On or about October 5, 2016, the shipment exited the United States and entered Canada, transiting in-bond to Montreal International Airport. On or about October 7, 2016, the shipment was re-exported from Canada to the United Arab Emirates.

46.    MIRNEZAMI, SARHANG, and co-conspirators then caused and hired a United Arab Emirates-based shipping company to reexport the Agilent 7890A Network Gas Chromatograph (GC), the Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS)

system and the Agilent 7693A Autosampler to Iran, occurring on or about October 11, 2016.

### Failure to Obtain Required Licenses

47.     The defendants and their co-conspirators failed to receive and possess, and caused others to fail to receive and possess, one or more license(s) from OFAC and BIS, both of which are located in the District of Columbia, to export any of the goods set forth above from the United States to Iran via the United Arab Emirates.

(**Conspiracy to Export U.S. Goods to Iran, via the United Arab Emirates, and to Defraud the United States,** in violation of Title 18, United States Code, Section 371)

### COUNT TWO

**(Unlawful Exports and Attempted Unlawful Export of Goods to Iran via the United Arab Emirates)**

48.     The allegations in Paragraphs 1 through 47 are incorporated and realleged by reference in this Count.

49.     On or about August 24, 2016, in the District of Columbia and elsewhere, Defendant REZA SARHANGPOUR KAFRANI, also known as "REZA SARHANG," and Defendant SEYED REZA MIRNEZAMI, did willfully export and reexport, and cause to be exported and reexported, and attempted to willfully export and reexport, and attempted to cause to be exported and reexported, a PerkinElmer Elan 9000 Inductively Coupled Plasma Mass Spectrometer (ICP/MS) from the United States to Iran, via the United Arab Emirates, without first having obtained the required authorization from OFAC and BIS.

(**Unlawfully Exporting and Attempting to Unlawfully Export Goods to Iran via the United Arab Emirates,** in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203 and 560.205; and Title 15, Code of Federal Regulations, Sections 764.2(a) and (b))

16

## COUNT THREE

**(Unlawful Exports and Attempted Unlawful Export of Goods to Iran via the United Arab Emirates)**

50.     The allegations in Paragraphs 1 through 47 are incorporated and realleged by reference in this Count.

51.     In or about October 2016, in the District of Columbia and elsewhere, Defendant REZA SARHANGPOUR KAFRANI, also known as "REZA SARHANG," and Defendant SEYED REZA MIRNEZAMI, did willfully export and reexport, and cause to be exported and reexported, and attempted to willfully export and reexport, and attempted to cause to be exported and reexported, an Agilent 7890A Network Gas Chromatograph, an Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS) system, and an Agilent 7693A Automatic Liquid Sampler (Autosampler), from the United States to Iran, via the United Arab Emirates, without first having obtained the required authorizations from OFAC and BIS.

**(Unlawfully Exporting and Attempting to Unlawfully Export Goods to Iran via the United Arab Emirates**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203 and 560.205: Title 15, Code of Federal Regulations, Sections 764.2(a) and (b))

## COUNT FOUR

### (Failure to File Electronic Export Information)

52.     The allegations in Paragraphs 1 through 47 of this Indictment are incorporated and realleged by reference herein.

53.     On or about the dates listed as to Count Two and Count Three above, within the District of Columbia and elsewhere, defendants REZA SARHANGPOUR KAFRANI, also known as "REZA SARHANG," and SEYED MIRNEZAMI, did knowingly and willfully cause

17

U.S. COMPANY 2 to fail to file export information, through the Automated Export System, in that the defendants, REZA SARHANG and SEYED MIRNEZAMI, falsely represented to U.S. COMPANY 2 that the ultimate country of destination for the items listed in Count Two and Count Three was Canada, when, in fact, defendants SARHANG and MIRNEZAMI knew that the ultimate country of destination for the items listed in Count Two and Count Three was Iran, via the United Arab Emirates.

**(Failing to Submit Export Information**, in violation of Title 13, United States Code, Section 305; Title 18, United States Code, Section 2(b); Title 15, Code of Federal Regulations, Sections 30.2, 30.16, and 30.37)

## COUNTS FIVE THROUGH TEN

### (International Money Laundering)

54.    The allegations in Paragraphs 1 through 47 of this Indictment are incorporated and realleged by reference herein.

55.    On or about the following dates, within the District of Columbia and elsewhere, Defendant REZA SARHANGPOUR KAFRANI, also known as "REZA SARHANG," transported, transmitted, and transferred a monetary instrument and funds from a place outside the United States, namely bank accounts in Canada and elsewhere, to a place in the United States, namely bank accounts in the United States, with the intent to promote the carrying on of a specified unlawful activity, *i.e.*, violating IEEPA, 50 U.S.C. § 1705, the ITSR, 31 C.F.R. Part 560, and the EAR, 15 C.F.R. Parts 730-774; and conspiring to violate IEEPA and other statutes in violation of 18 U.S.C. § 371.

56.    Specifically, the transactions described in Counts Five through Ten were payments made by defendant SARHANG to U.S. COMPANY 2 for the purpose of purchasing and illegally

18

exporting a PerkinElmer Elan 9000 Inductively Coupled Plasma Mass Spectrometer (ICP/MS), an Agilent 7890A Network Gas Chromatograph (GC), an Agilent 7000B Triple Quadropole Gas Chromatography-Mass Spectrometry (GC/MS) system, and an Agilent 7693A Autosampler, without first applying for, and obtaining by such application, the necessary licenses and authorizations before sending and exporting those items from the United States to Iran, via the United Arab Emirates.

   a.   **Count Five:** On or about August 19, 2016, defendant SARHANG caused an international wire to be sent from a Taiwan-based Shanghai Commercial and Savings Bank account in the amount of approximately $11,855 (less fees of $28) to a U.S.-based Bank of America account owned by U.S. COMPANY 2.

   b.   **Count Six:** On or about September 19, 2016, defendant SARHANG sent a wire transfer from a Canadian-based Royal Bank of Canada account in the amount of approximately $10,000 (less fees of $20) to a U.S.-based Bank of America account owned by U.S. COMPANY 2.

   c.   **Count Seven:** On or about September 21, 2016, defendant SARHANG caused an international wire to be sent from a China-based The Agricultural Bank of China account in the amount of approximately $15,245 (less fees of $55) to a U.S.-based Bank of America account owned by U.S. COMPANY 2.

   d.   **Count Eight:** On or about September 29, 2016, at the direction of the defendant SARHANG, a Canadian-based co-conspirator sent a check from

19

Candian-based Canadian Imperial Bank of Commerce account in the amount of approximately $20,000, which was deposited into a U.S.-based United Bank account owned by U.S. COMPANY 2.

e.     **Count Nine:** On or about September 28, 2016, defendant SARHANG sent a check from a Canadian-based Royal Bank of Canada account in the amount of approximately $27,000, which was deposited into a U.S.-based United Bank account owned by U.S. COMPANY 2.

f.     **Count Ten:** On or about September 29, 2016, at the direction of the defendant SARHANG, a Canadian-based co-conspirator made a credit card payment using a Capital One Visa account in the amount of approximately $4,024, which was deposited into a U.S.-based Bank of America account owned by U.S. COMPANY 2.

(**International Money Laundering,** in violation of Title 18, United States Code, Section 1956(a)(2)(A))

## FORFEITURE ALLEGATION

57.     Upon conviction of any of the violations alleged in Counts One through Count Ten of this Indictment, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these violations, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment against the defendants in an amount of at least **$110,739,** which represents a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these violations.

58.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants,

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the Court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property that cannot be subdivided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1); and Title 28, United States Code, Section 2461(c).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Sections 982(a)(1) & (b)(1); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

*Channing D. Phillips /SM*

Attorney of the United States in
and for the District of Columbia