**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **1:21-cr-501** |
| | **:** | |
| **REZA SARHANGPOUR KAFRANI** | **:** | **Judge Sullivan** |
| **aka REZA SARHANG,** | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S**
**MOTION FOR PRETRIAL RELEASE**

## Introduction

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits this opposition to the motion for pretrial release by defendant Reza Sarhangpour Kafrani (the "Defendant" or "Kafrani"). In summary, the government submits that there is strong evidence to believe that the Defendant poses a serious risk of flight. The Defendant resided in Canada at the time of his arrest and is a citizen of Iran. The Defendant has never resided in the United States, nor does he have any known ties generally to the United States or specifically to the Washington, D.C. area. The Defendant stands charged by indictment with various felonies related to the illegal export of sophisticated laboratory equipment to Iran and the United Arab Emirates ("UAE"), including violations of 18 U.S.C. § 371, conspiracy, 50 U.S.C. § 1705, criminal violations of the International Emergency Economic Powers Act ("IEEPA"), 13 U.S.C. § 305, unlawful export information activities, and 18 U.S.C. § 1956(a)(2)(A), international money laundering. These charges are supported by the Defendant's own electronic communications and admissions to law enforcement. Critically, the Defendant's multiple unsuccessful export license applications and electronic communications with his co-

conspirator indicate a sophisticated understanding of U.S. export controls and support the government's allegation that the Defendant acted willfully.

The Defendant argues that he is not a flight risk and proposes various conditions of release to assure his appearance at trial. The Defendant's argument with respect to his flight risk relies primarily on two incorrect assertions. First, the Defendant states that the government's position is based solely on the Defendant's Iranian citizenship, downplaying his strong ties abroad, his complete lack of ties to the United States, and the strong evidence of the Defendant's serious criminal wrongdoing. Second, the Defendant asserts that his ties to the community *in Canada* support his pretrial release, while they prove the exact opposite—that he has a significant incentive to flee this district. Finally, the Defendant's proposed conditions of release are inadequate, unenforceable, or too vague to properly evaluate, and would not provide reasonable assurances to the Court.

**Procedural History**

On July 5, 2021, Kafrani entered the United States via the U.S.-Canadian border. While the Defendant was at the border, Magistrate Judge G. Michael Harvey signed a criminal complaint, charging the Defendant with violations of 18 U.S.C. § 371 (Conspiracy) and 50 U.S.C. § 1705 (IEEPA and the Iranian Transactions and Sanctions Regulations). On July 7, 2021, the Defendant was presented to a Magistrate Judge in the Northern District of New York. The Defendant waived his right to a detention hearing at that time, but reserved his right to object to his detention upon his arrival in the District of Columbia.

On July 30, 2021, a grand jury in the District of Columbia returned an indictment, which charged Kafrani with violations of 18 U.S.C. § 371 (Conspiracy), 50 U.S.C. § 1705 (IEEPA), 13 U.S.C. § 305 (Failure to File Electronic Export Information), and six counts of 18 U.S.C.

§ 1956(a)(2)(A) (International Money Laundering).

On August 3, 2021, Magistrate Judge Robin Meriweather held an arraignment and detention hearing as to Kafrani. At that time, the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(A) based on the Defendant's serious risk of flight. The Defendant requested that the issue of detention be deferred until such time that he could present a bail package to the Court.

**Factual Background**

Kafrani, and his co-defendant, Seyed Reza Mirnezami ("Mirnezami"), were co-owners of Prolife Global, and in February 2015, they began attempting to procure laboratory equipment from U.S. companies for shipment to Iran. In May 2015, Kafrani and Mirnezami inquired with the Canadian government on how to purchase laboratory instruments from Canada and send them to Iran. The Canadian government informed Mirnezami about Canadian sanctions against Iran. A few months later, in October 2015, Mirnezami sent Kafrani an email with a link to a news article titled "Montreal men accused of illegally exporting railway equipment to Iran," accompanied by a note that read, "This is dangerous! We have to talk." Approximately a month later, Mirnezami sent Kafrani an email with several links to websites for the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") and the Bureau of Industry and Security of the U.S. Department of Commerce ("BIS") related to U.S. export control and sanctions regulations.

Undeterred, in early November 2015, Mirnezami and Kafrani began negotiations with U.S. Company 1 for the purchase of mass spectrometry instruments, which they claimed were for export to Canada.[1] On November 10, 2015, however, Kafrani sent an email to a representative of U.S.

---

[1] Mass spectrometers can be used to monitor the performance of uranium enrichment processes composition of materials. In particular, they allow those enriching uranium to determine the level of enrichment, which is an essential part of enriching uranium for nuclear power and/or weaponization efforts.

Company 1, asking about installation costs in the Middle East. The following day, presumably following some form of communication other than email, a representative of U.S. Company 1 emailed Kafrani, saying "You know there are sanctions in place for Iran. I thought this equipment was going to Montreal QB. Thanks for wasting my time." Kafrani responded to U.S. Company 1, incorrectly telling them that "spectrometry instruments can be exported to Iran without needing permission from OFAC office."

On November 15, 2015, a few days after telling U.S. Company 1 that an OFAC license was not needed, Kafrani and Mirnezami nevertheless applied for a license from OFAC to export a liquid chromatography system and mass spectrometer from U.S. Company 1 to the Ebn Sina Laboratory in Iran. In February 2016, OFAC responded to the application, requesting more information, including an EAR99 commodity classification from BIS.[2] Kafrani and Mirnezami submitted an application to BIS in March 2016. A couple of weeks later, in April 2016, BIS responded to the application and provided a Return Without Action ("RWA") notice, directing them back to OFAC as the agency responsible for administering U.S. sanctions on Iran. Notably, the RWA confirmed the items in question were not EAR99, but were instead controlled for export under Export Control Classification Numbers ("ECCN") 3A999[3] and 3A233.[4] Ultimately, negotiations with U.S. Company 1 ended without a sale.

---

[2] EAR99 items generally consist of low-technology consumer goods, do not require a license in most situations and are not listed on the Commerce Control List (CCL).

[3] Items controlled under ECCN 3A999 are controlled for reasons of Anti-Terrorism and may not be exported to Iran without a license.

[4] Under the CCL, mass spectrometers that are capable of measuring ions of 230 atomic mass units or greater and have a resolution of better than 2 parts in 230 are controlled under ECCN 3A233. The most common isotopes used in the production of nuclear weapons are uranium-235 and plutonium-239, which have an atomic mass above 230. Accordingly, a mass spectrometer that can measure atomic mass above 230 is required to measure nuclear fissile material. Items controlled under ECCN 3A233 are controlled for reasons of Anti-Terrorism and Nuclear Nonproliferation, and may not be exported to Iran or UAE without a license, among other countries.

In March 2016, Kafrani began negotiations with U.S. Company 2 for the purchase of the same or similar equipment he was attempting to purchase from U.S. Company 1. Kafrani and Mirnezami led U.S. Company 2 to believe the items were destined for Canada, and successfully purchased a PerkinElmer Elan 9000 Inductively Coupled Plasma Mass Spectrometer (ICP/MS),[5] an Agilent 7890A Network Gas Chromatograph (GC),[6] an Agilent 7000B Triple Quadropole Gas Chromatography-Mass Spectrometry (GC/MS) system,[7] and an Agilent 7693A Automatic Liquid Sampler (Autosampler)[8] for $110,739. Kafrani paid U.S. Company 2 through a series of 8 financial transactions, including several wire transfers or personal checks originating from or drawn on international financial institutions, including Shanghai Commercial and Savings Bank, Royal Bank of Canada, The Agricultural Bank of China, and Canadian Imperial Bank of Commerce.

The first item to ship was the PerkinElmer Elan 9000 ICP/MS. On August 24, 2016, Kafrani and Mirnezami directed U.S. Company 2 for shipment to Canada. Once in Canada, the defendants coordinated with a Canadian shipping company to reexport the item to the UAE.  Once the instrument arrived safely in the UAE, Kafrani and Mirnezami coordinated with a shipping company based in the UAE to reexport it to Iran on September 25, 2016.

In September 2016, the Agilent 7890A Network Gas Chromatograph (GC), an Agilent 7000B Triple Quadropole Gas Chromatograph Mass Spectrometer (GC/MS) system, and  Agilent 7693A Automatic Liquid Sampler (Autosampler) ("Shipment 2") shipped from U.S. Company 2. Kafrani and Mirnezami arranged for a Canadian shipping company to pick Shipment 2 up from

---

[5] The Elan 9000 ICP/MS was classified on the CCL under ECCN 3A233 and controlled for both Anti-Terrorism and Nuclear Nonproliferation reasons, therefore it required a license for export both to the United Arab Emirates and to Iran.

[6] The Agilent 7890A Network Gas Chromatograph was classified on the CCL under ECCN 3A999.f and controlled for Anti-Terrorism reasons, therefore it required a license for export to Iran.

[7] The Agilent 7000B Gas Chromatograph Mass Spectrometer (GC/MS) system was classified on the CCL under ECCN 3A233 and controlled for Anti-Terrorism and Nuclear Nonproliferation reasons, therefore it required a license for export to the United Arab Emirates and to Iran.

[8] The Agilent 7693A Autosampler was classified under EAR99, so it required a license for export to Iran.

U.S. Company 2 and export the items to Canada.  On October 5, 2016, Shipment 2 exited the United States and entered Canada, transiting in-bond[9] to the Montreal International Airport, after which it was reexported to the UAE on October 7, 2016.  Kafrani and Mirnezami then engaged a UAE-based shipping company to reexport Shipment 2 to Iran, which occurred on October 11, 2016.

## Legal Standard

Under the Bail Reform Act, courts consider the following factors in determining whether some condition, or combination of conditions, will reasonably assure the defendant's appearance at trial and pre-trial proceedings: the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). *See United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014) (*Bikundi I*); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 n.1 (D.D.C. 2013).

When the government seeks to detain a defendant on the ground that the defendant is a risk of flight pursuant to 18 U.S.C. § 3142 (f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). At a detention hearing, the government may present evidence by way of a proffer. *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *United States v. Roberson*, No. 15-cr-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015).

---

[9] In-bond shipments are shipments that have not been cleared by customs and are transported, stored, or handled with security to the government provided by indemnity bonds, but the goods are never intended to enter the stream of commerce of the country through which they pass.

**The Defendant Presents a Serious Risk of Flight**

1. **Nature and Circumstances of the Offenses Charged**

The nature and circumstances of the offenses charged are serious and overwhelmingly support detention in this case. The Defendant is charged with willfully violating U.S. export controls intended, in part, to prevent the proliferation of dual-use items that could contribute to the development of nuclear-related technology. If convicted, the Defendant faces a maximum sentence of twenty years' imprisonment under IEEPA. 50 U.S.C. § 1705. Under the applicable sentencing guidelines, the base offense level for IEEPA violations related to "national security controls or controls relating to the proliferation of nuclear . . . weapons or materials" is 26. U.S.S.G. § 2M5.1(a)(1); *see also United States v. Sihai Cheng*, 392 F. Supp. 3d 141, 155 (D. Mass. 2019) (imposing sentence under base offense level 26 for conviction related to "illicit scheme to export pressure transducers, highly sensitive goods with nuclear applications, from the United States to Iran through China"). Assuming no criminal history for the Defendant, that base offense level translates to a sentencing range of 63-78 months (or 46-57 months with full acceptance of responsibility). The Defendant therefore likely faces a significant sentence if convicted. *See, e.g.*, *United States v. Ghorbani*, No. 18-cr-00255-PLF, Detention Memorandum, Dkt. 26 (Sept. 5, 2018), at 12 (finding that defendant faced "significant penalties" based on a guidelines range of 63-78 months for charges under IEEPA, which "makes it more likely that [he] would attempt to flee prosecution") (quoting *United States v. Amar*, 300 F. Supp. 3d 287, 289 (D.D.C. 2018)); *see also United States v. Languerand*, No. 21-cr-353 (JDB), 2021 WL 3674731, at *12 (D.D.C. Aug.

19, 2021) (finding that defendant faced "the possibility of significant jail time" and "a potentially lengthy sentence" based on an estimated guidelines range of 63-78 months).

Further, the crimes the Defendant is alleged to have committed, which are based on U.S. sanctions against Iran, are considered "political offenses" by many foreign governments. Such offenses are generally excluded from the list of offenses subject to extradition in extradition treaties to which the United States is a party. Therefore, if the Defendant were to flee even to a country with which the United States has an extradition treaty, the charges against the Defendant could prevent his extradition.

### 2.  Weight of the Evidence Against the Defendant

The government's evidence against the Defendant is strong. The Defendant's own email communications make clear his knowing participation in a scheme to purchase export-controlled laboratory equipment from two different U.S. companies in order to sell that equipment to end-users in Iran. Moreover, the Defendant's communications demonstrate strong evidence of willful misconduct fully aware of the prohibitions under U.S. law of exporting the equipment at issue to Iran. The Defendant and his co-defendant corresponded regarding the risk posed by U.S. sanctions against Iran, including an email sent prior to the exports at issue in which Mirnezami informed Kafrani of criminal charges against individuals in Montreal for exporting equipment to Iran and flagging to Kafrani that sanctions on Iran were "dangerous." Mirnezami then sent Kafrani various links to U.S. government websites describing U.S. sanctions on Iran. Later, the Defendant also exchanged emails with one U.S. company regarding that company's unwillingness to sell laboratory equipment specifically because of U.S. sanctions against Iran. Then, despite falsely informing that U.S. company that the exports in question needed no license, Kafrani and Mirnezami applied unsuccessfully for export licenses from OFAC and BIS. Despite the knowledge

that a license was required for export, and despite not receiving a license after three separate license applications, Kafrani and Mirnezami nonetheless proceeded to purchase the export-controlled laboratory equipment under the false pretense that it would be shipped to Canada, then cause it to be shipped to Canada, the UAE, and ultimately to Iran. The Defendant's conduct represents a quintessential case of willful violations of U.S. export controls, demonstrated primarily by his own communications.

### 3.  The History and Characteristics of the Defendant

The history and characteristics of the Defendant weigh strongly against his release. The Defendant has no known ties to the community in Washington, D.C. or to the United States, and has substantial ties abroad. The Defendant has never resided in the United States. In fact, the Defendant's travel to the United States on July 5, 2021, was his first known travel to the United States. The Defendant is a citizen of Iran who was residing in Canada at the time of his arrest. The charges against the Defendant relate to complex international commercial transactions involving international shipping and cross-border financial transactions. Beyond the charges, the Defendant also has known international business interests—including in both Iran and Canada—and stated in a voluntary interview with law enforcement that he has family in Iran and has an unclear amount of money in Iranian bank accounts. The Defendant also has significant and recent international travel experience, including to Iran.

The Defendant argues that he does not present a serious risk of flight because of his strong ties and community in Canada. *See, e.g.*, Defendant's Motion for Bond ("Deft. Mot."), Dkt. 13 (Aug. 30, 2021), at 3 ("Surely, a man married to the same woman for 50 plus years is unlikely to flee leaving behind his wife and two children.");[10] Deft. Mot. at 9 ("[I]f he flees, he risks all that

---

[10] This is presumably a typographical error, as the Defendant was born in 1975 and is only 46 years old.

he has worked so hard to build these last eight years in Canada."). But the Defendant's argument is backwards; the primary risk in this case is that the Defendant will flee *to Canada*. The government does not doubt the Defendant's strong ties to his community in Montreal, the presence of his family in Canada, and his academic and business interests in Canada—but those are ties to a foreign country, not to this district. The Defendant's strong ties to Canada weight in favor of finding that he poses a serious risk of flight. *See, e.g.*, *United States v. Morrison*, No. 16-MR-118, 2016 WL 7421924, at 4 (W.D.N.Y. Dec. 23, 2016) ("But there nevertheless is a significant flight risk in this case. The defendants lack ties not only to the Western District of New York but to the United States as a whole. They reside in Canada, and the property they own is in Canada. They retain their Romanian citizenship. And their most immediate and significant family member— their son Albert, whom defense counsel blames as the culprit—also permanently resides in Canada."); *see also United States* v. *Bikundi*, 73 F. Supp. 3d 51, 58 (D.D.C. 2014) (*Bikundi II*) ("Overseas ties such as those proffered by the government, combined with a defendant's lack of legal status in this country militate strongly in favor of detention on grounds that the defendant presents a flight risk."); *United States v. Ali*, 793 F. Supp. 2d 386, 392 (D.D.C 2011) ("Mr. Ali similarly lacks current ties to the Washington metropolitan region and to the United States. Mr. Ali has significant contacts overseas, as he resides in Somalia, where his young son remains.").

The Defendant's potential flight to Canada poses a significant risk to the government's case. While Canada and the United States have signed an extradition treaty, if the Defendant were to flee to Canada, an effort to extradite him to the United States might be unsuccessful based on a variety of factors. Even if the government were to successfully extradite the Defendant from Canada, such a process would almost certainly be lengthy and burdensome. *See, e.g.*, *United States v. Georgiou*, No. 08-1220-M, 2008 WL 4306750, at *2  (E.D. Pa. Sept. 22, 2008) ("Should he not

return, the Government would have to commence extradition proceedings in Canada which may take several years to resolve . . . ."); *United States v. Stroh*, No. 396CR139AHN, 2000 WL 1832956, at *5 (D. Conn. Nov. 3, 2000) ("At any event, extradition from Israel (or any other country) would be, at best, a difficult and lengthy process and, at worst, impossible."). And Canadian courts often grant bail to defendants while they are in extradition proceedings, which would allow the Defendant and his family another opportunity to flee. *See, e.g.*, *United States v. Kollmar*, No. 19-mj-70677-MAG-1 (KAW), 2019 WL 2163005, at *4 (N.D. Cal. May 17, 2019) (noting that "Canada has released defendants being sought for extradition on similar or more serious charges" than rape).

Aside from Kafrani's ties to Canada, he has substantial ties to Iran and significant recent travel to Iran.  He is a citizen of Iran and moved to Canada in 2014.  According to Canadian records, the defendant was on 10 international flights entering Canada between February 1, 2015, and October 27, 2019. The Canadian records reviewed by investigators do not, however, indicate the countries from which the flights originated. Additionally, the Defendant was on three flights originating in or ultimately destined for Iran that travelled through United States airspace. On June 8, 2014, the Defendant traveled from Esfahan, Iran thru Istanbul, Turkey to Montreal, Canada; on June 1, 2015, the Defendant traveled from Tehran, Iran thru Frankfurt, Germany to Montreal, Canada; and on July 8, 2019, the Defendant was listed on an outbound flight manifest from Canada thru Qatar to Iran.

**No Condition or Combination of Conditions Will Reasonably Assure the Defendant's Appearance in Court**

### 1. The Defendant's Proposed Conditions Regarding His and His Family's Passports and Consular Access are Unenforceable

As part of the Defendant's proposed bail conditions, he offers (i) a promise from the Iranian Interests Section in Washington, D.C. to not issue him another passport while this case is pending, (ii) a geographical restriction ordering him to refrain from contacting any consulate to procure travel papers, whether in-person or electronically, and (iii) to have the U.S. government seize his family's passports. But these promises are unenforceable and will not provide any assurances to the Court.

First, the Defendant offers an apparent promise from the Iranian Interests Section "that they will not issue to Mr. Kafrani any travel documentation while this indictment remains pending." Deft. Mot. at 12 & Ex. H. But this Court has no authority to compel a sovereign state's actions with respect to its own citizens and no ability to enforce that promise, especially against a country with which the United States has no diplomatic relations. That leaves the Defendant in the same situation as any other Iranian national in the United States, who "could obtain another passport from Iran through its 'Interests Section' located in the Pakistani Embassy in Washington, D.C., which is Iran's de facto consular representation in the United States." *United States v. Ghorbani*, Case No. 18-cr-00255-PLF, Detention Memorandum, Dkt. 26 (Sept. 5, 2018), at 14-15.[11]

Second, the Defendant proposes that the Court impose "a geographical restriction ordering Mr. Kafrani to refrain from appearing or contacting any consulate to procure travel papers, whether

---

[11] Even if the Defendant were unable to secure another passport, the lack of a passport does not eliminate a risk of flight to Canada. *See, e.g.*, *United States v. Abad*, 350 F.3d 793, 799 (8th Cir. 2003) ("Taking possession of [defendant's] passport has little flight deterrence considering the ease of travel to Mexico and Canada.").

in-person or electronically." Deft. Mot. at 7. But even with such an order in place, the Court cannot functionally stop the Defendant from reaching a consular facility and nor could the Court retrieve the Defendant once he had reached a consular facility. "The behavioral prohibitions are essentially unenforceable promises to not engage in behavior that might facilitate the defendant's flight from this jurisdiction or from the United States and, standing alone, provide no assurance that [the Defendant] will remain here for trial." *United States v. Anderson*, 384 F. Supp. 2d 32, 41 (D.D.C. 2005). Indeed, if the Defendant were to "enter the Pakistani Embassy in Washington . . . or that of another country friendly to Iran, he could remain outside the reach of this Court indefinitely." *United States v. Ghorbani*, Case No. 18-cr-00255-PLF, Detention Memorandum, Dkt. 26 (Sept. 5, 2018), at 14.

Moreover, based on the doctrines of inviolability and diplomatic immunity, U.S. law enforcement may not enter foreign consulates and embassies, nor the residences and automobiles of diplomats, outside of narrow public safety exceptions. From a practical standpoint, the Defendant could enter any diplomatic vehicle belonging to any diplomat, any consulate, or any embassy and remain outside the reach of this Court indefinitely. Further, should the Defendant enter and remain in a diplomatic vehicle, U.S. law enforcement would be powerless to stop that vehicle from driving outside the United States, and beyond the reach of the Court, with the Defendant inside.

Third, the Defendant offers that his wife and daughters living in Montreal, Canada will surrender their passports to the government. Deft. Mot. at 6. It is unclear what passports the Defendant's family may hold, but the government presumes that they hold Canadian and/or Iranian passports. But even if those passports were provided to the government and held while this case is pending, the Defendant's family could at any time secure additional passports from Canadian

and/or Iranian authorities in Canada. This Court would also have no authority to compel the Defendant's non-U.S. citizen family members living outside the United States, let alone authority over the consular authorities in Canada of two separate sovereign nations.

**2. The Defendant Would Remain a Flight Risk Even With GPS Monitoring**

While an effective tool in some circumstances, GPS monitoring has limited utility in preventing Kafrani from fleeing. Supervisees on GPS monitoring are not subjected to around-the-clock, real time monitoring by their supervising officer. Moreover, warrants are not issued moments after a defendant leaves his designated area. For example, if a supervisee were to violate the terms of his release by leaving his prescribed area on a Friday at 6:00 p.m., practically speaking, a warrant might not issue until sometime on Monday, giving a minimum of 2 ½ days to abscond. Were Kafrani take advantage of this time delay, he could easily cross the border into Canada, and out of this Court's jurisdiction. *See, e.g.*, *Ali*, 793 F. Supp. 2d at 392 ("Furthermore, electronic monitoring would give [defendant] ample lead time if he wished to flee the country.") (citing *United States v. Townsend*, 897 F.2d 989, 994-95 (9th Cir. 1990) ("Nor does the wearing of an electronic device offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction.")); *United States v. Lorenzana-Cordon*, No. 03-cr-331-13 (CKK), 2015 WL 5011445, at *4 (D.D.C. Aug 24, 2015) ("Although electronic monitoring is a method for monitoring a defendant's whereabouts, it does not prevent a defendant from absconding."); *Stroh*, 2000 WL 1832956, at *5 ("In addition, the home confinement and electronic monitoring suggested by [defendant] is not a condition that would reasonably assure his presence at trial. These restrictions can easily be circumvented.").

### 3. The Defendant's Other Proposed Conditions are Too Vague to be Meaningfully Considered by the Court

The Defendant also offers several other proposed conditions of release that will purportedly assure his appearance at court hearings, including (i) "the posting of a bond before release" and (ii) the Defendant's "home confinement under the supervision of Imam Nahidian and others at the Manassas Mosque." Both of these proposed conditions are too vague to warrant consideration by the Court at this time and should be rejected as insufficient.

First, the Defendant offers to post a "significant monetary bond," Deft. Mot. at 15, and notes that "[s]ureties *can be found* who would agree to be jointly and severally liable for a bond before Mr. Kafrani's release." *Id.* at 10 (emphasis added). But the Defendant's imprecise language and use of the passive voice makes clear that he has found no such surety, nor has he offered a suitable bond to be posted by that person (or persons).  It would be significant, for example, if Kafrani's bail package did not include any of his own assets. Simply put, the Defendant asks the Court to agree in advance that *someone* with *some* relationship to the Defendant posting a bond of *something* would be sufficient. But based on the Defendant's proposal, "[t]he Court simply has no basis to conclude that the possible loss to [the unidentified surety] would impact [the Defendant] sufficiently to ensure [his] presence at trial." *United States v. Hong Vo*, 978 F. Supp. 2d 41, 46 (D.D.C 2013); *see also United States v. Tajideen*, No. 17-cr-46 (RBW), 2018 WL 1342475 (D.D.C Mar. 15, 2018) (denying defendant's proposal to post brother-in-law's home as security as insufficient). Nor has the Defendant offered to post a bond in any amount himself. *See, e.g.*, *Anderson*, 384 F. Supp. 2d at 44 ("In addition, any plan [for supervised release] would have to include the posting of a substantial money bond by [the Defendant] himself.").

In order to assess what impact financial bond conditions may have, it is imperative to have a complete and accurate picture of a defendant's financial situation. *United States v. Magnifico*,

No. 8:02-cr-129-T-23TBM, 2008 WL 276033, at * (M.D. Fla. Jan. 31, 2008) ("[A]bsent a complete assessment of [defendant's] financial resources, an observer lacks any reliable notion of the financial gravity to [him] of losing $500,000 (or half that amount or five times that amount or any other amount)."). It is unclear what assets Kafrani may have and the available information appears mixed. For example, he has represented to the Court that he is unable to afford his own attorney but states that he can rent an apartment in Washington, D.C. on short notice and for an uncertain duration, if necessary. *See* Deft. Mot. at 6 n.2 ("If for some material reason this arrangement in unacceptable to Pretrial Services, Mr. Kafrani can rent an apartment in D.C. for the duration."). Also, in his interview with law enforcement, Kafrani stated that in the past several years he had sold a business for approximately $700,000 and 70 hectares of valuable land in Iran for $1 million, but it is unclear what profits he made from those transactions and whether proceeds from the sales still exist. Notwithstanding other factors discussed herein, without a complete picture of the Defendant's finances, it is difficult to fully assess how his personal financial situation impacts his flight risk.

Second, the Defendant proposes that he be released under the supervision of Imam Abolfazl Nahidian of the Manassas Mosque, "and others." Deft. Mot. at 6. As an initial matter, the Defendant's proposed third-party custodian should be rejected because it is not clear who his proposed custodians are—"and others" is too vague for proper evaluation. *See, e.g.*, *United States v. Klein*, 2021 WL 1751056, at *7 (D.D.C. May 4, 2021) (denying defendant's pretrial release because he "has failed to provide Pretrial Services or the Court with a well-developed proposal" and "the propriety of [his] pretrial release turns, in large part, on where he will live *and who will take responsibility for ensuring that he complies with the terms of his (possible) release*") (emphasis added). And the Defendant has apparently not asked Pretrial Services to vet Mr.

Nahidian or any other individual, which is also a necessary requirement for the Court's consideration. *See, e.g.*, *Anderson*, 384 F. Supp. 2d at 44 (rejecting defendant's proposed home confinement under watch of a private security company because "[b]efore approving any such plan, the Court would want at a minimum to have background checks done on each individual proposed to provide such services by Pretrial Services or some other court-related entity"); *Klein*, 2021 WL 1751056, at *7 (noting that defendant may renewal motion for pretrial release with, among other things, "a suitable third-party custodian that Pretrial Services vetted").

Once any would-be third-party custodians are identified and vetted, the Court may then properly evaluate whether the proposed custodian(s) would reasonably assure the Defendant's appearance at trial, including assessing whether the custodian(s) would be required to post a bond as well. *See, e.g.*, *Tajideen*, 2018 WL 1342475 at *7 ("[T]he Court is not persuaded that the potential consequences Guidepost theorizes it would suffer if the defendant escaped its custody [are] sufficient to ensure the defendant's presence at further court proceedings."); *Hong Vo*, 978 F. Supp. 2d at 46-47 (rejecting a defendant's proposal to use a cousin with whom she "was not close" but "would responsibly discharge his duties as third-party custodian based on a sense of familial obligation" because the court found that "the sense of familial obligation of a distant relative with whom [the defendant] is not close is not likely to reasonably assure her appearance at trial").[12]

---

[12] The government notes that a brief review of open source media reporting on Mr. Nahidian reveals information that may call into question his suitability as a third-party custodian and at minimum warrants scrutiny from Pretrial Services and the Court. *See, e.g.*, Jeff Stein, *Where is Robert Levinson? Inside the Secret Campaign to Find Ex-FBI Agent Who Disappeared on Mission to Iran*, NEWSWEEK (Mar. 8, 2019), available at https://www.newsweek.com/robert-levinson-fbi-agent-iran-rescue-1356990 ("One of the [Imam Nahidian's] contacts, according to the detective, was David Belfield, an African-American convert to Islam who had taken the name Dawud Salahuddin and in 1980 carried out an assassination of an anti-regime activist in Potomac, Maryland [and now lives in Iran]."); Ira Silverman, *An American Terrorist*, NEW YORKER (July 28, 2002), available at https://www.newyorker.com/magazine/2002/08/05/an-american-terrorist ("[Salahuddin] had been arrested in New York on November 4, 1979—the day the siege of the American Embassy in Tehran began—with Bahram Nahidian,

**Conclusion**

For the foregoing reasons, the government respectfully moves this Court to deny the

Defendant's motion for pretrial release and order that he be detained pending trial.


CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


_____/s/_____
Christopher Tortorice
Assistant United States Attorney
Texas Bar No. 24048912
(202) 252-7155
555 4th Street, NW, 11TH Floor
Washington, D.C. 20530

Beau D. Barnes
Trial Attorney
D.C. Bar No. 1024150
Counterintelligence & Export Control Section
National Security Division
U.S. Department of Justice
(202) 305-4679
950 Pennsylvania Avenue NW
Washington, D.C. 20530

---

Ayatollah Khomeini's operative, and a group of pro-Khomeini demonstrators who briefly chained themselves to the railings at the crown of the Statue of Liberty and unfurled a banner denouncing the Shah.").